## PERMUTIT CO. v. WADHAM et al.

(District Court, E. D. Michigan, S. D.   November 8, 1923.)

No. 277.

1. Patents ⊜328—No. 1,195,923, for water-softening apparatus, claims 1 and 5, held void for anticipation.

The Gans patent, No. 1,195,923, for apparatus for softening water by the zeolite process and for regenerating the zeolites, claims 1 and 5, *held* void for anticipation by the prior art and publications.

2. Patents ⊜150—Claim for apparatus, which is old cannot be saved by disclaimer limiting it to a particular manner of use.

A disclaimer, which admits that the apparatus claimed per se is old, cannot save the claim by limiting the apparatus to a particular manner of use.

⊜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**3. Patents ⬤⟿150—Office of disclaimer is to correct excessive claims, due to inadvertence, accident, or mistake.**

A disclaimer can be availed of only where, through inadvertence, accident, or mistake, a patent has been granted for more than the applicant was entitled to claim, and not where the claim was deliberately made, with full knowledge of the prior art, which anticipated it.

**4. Words and phrases—"Zeolites."**

"Zeolites" are minerals which have the peculiar faculty of exchanging the base with which they may be chemically combined for another, which is present in a solution brought into contact with them.

**5. Words and phrases—"Zeolite process."**

The "zeolite process" of softening water consists in passing hard water through a filter bed of granular sodium zeolites, which exchange their sodium base for the calcium and magnesium in the water.

**6. Words and phrases—"Regeneration."**

The term "regeneration," as applied to the zeolite process of softening water, refers to the re-establishment in the zeolites of a sodium base, which in the original process has been exchanged for a calcium base, and is accomplished by bringing the zeolites in contact with a solution of sodium chloride or common salt brine.

In Equity. Suit by the Permutit Company against Frank L. Wadham and others. Decree for defendants.

James Q. Rice and M. C. Massie, both of New York City, and Whittemore, Hulbert, Whittemore & Belknap, of Detroit, Mich., for plaintiff.

Walter A. Knight, of Cincinnati, Ohio, Franklin M. Warden, of Chicago, Ill., and William M. Swan, of Detroit, Mich., for defendants.

TUTTLE, District Judge. The plaintiff, the Permutit Company, a corporation of Delaware, brought its bill of complaint in this court against Frank L. Wadham, Barnet Dalitz, Aaron Jackson, and Nathan Dalitz, a copartnership doing business in Detroit under the name and style of Massachusetts Laundry Company. The original bill charged infringement of United States letters patent No. 1,195,923, for the softening of water, granted August 22, 1916, to J. D. Riedel Aktiengesellschaft, of Germany, on the application of Robert Gans, filed August 5, 1911, and also charged infringement of United States letters patent No. 1,276,629, of August 20, 1918, for method of an apparatus for softening water, which were granted to the plaintiff on an application of Thomas R. Duggan, filed October 23, 1916. Plaintiff acquired ownership of the Gans patent through assignment from the Riedel Aktiengesellschaft.

The apparatus complained of was manufactured and installed for the Massachusetts Laundry by the Borromite Company of America, which intervened and became a party defendant.

After certain depositions had been taken on behalf of defendants, the plaintiff withdrew the Duggan patent by filing an amended bill omitting reference thereto.

[1, 4-6] The Gans patent relates to the art of softening water by what is known as the zeolite process. The softening is accomplished by merely passing hard water through a filter bed of granular sodium

zeolites. Zeolites are minerals which have the peculiar faculty of exchanging the base with which they may be chemically combined for another which is present in a solution brought into contact with the zeolites. In their use for softening water, the zeolites—or, as they are sometimes known, the double silicates of alumina, or of iron, or of both, as the case may be—when containing a sodium base will exchange that base for the calcium and magnesium in hard water; the exchange continuing until the sodium in the zeolites has been exhausted. This exchange leaves the water soft. These same zeolites, now having a calcium base, may be re-established as agencies for the further softening of water by bringing them into contact with a solution of sodium chloride, or common salt brine, in which case the brine picks up the calcium from the zeolites and leaves in its place an equal amount of sodium. This step of the process is commonly called "regeneration."

The Gans patent provides apparatus in which the softening of water and the regeneration of the zeolites may be carried on alternately. The patent does not purport to cover the zeolites themselves, or their use for the softening of water. Zeolites, their properties, and their utility in this direction had been known and described many years prior to the filing of the application for the Gans patent.

Zeolites are of two general classes—those found in nature and those prepared artificially. Gans, the inventor of the patent in suit, may be given credit for having discovered and perfected certain methods of preparing zeolites synthetically. With his discoveries in this direction the commercial use of zeolites commenced. Later on, when the art was established in this country, certain deposits of glauconite, commonly known as "green sand," present in large quantities in New Jersey and elsewhere, were found to have all of the properties and characteristics necessary in the softening of water by the base exchange method, and to be readily adaptable for commercial utilization.

The plaintiff uses zeolites of the artificial type, while defendants use the green sand. There is no contest in this case over the right of defendants to use their zeolites. The whole question centers about the apparatus in which these zeolites are employed; the Gans patent in suit relating solely to apparatus. The structural elements of the Gans apparatus may be summarized as comprising a cylindrical casing, having a mechanical filter bed of sand or quartz in the upper portion and a filter bed of zeolites in the lower portion thereof, with suitable pipes and valves to permit and control the passage of hard water through the casing and through the filter bed of zeolites therein for softening the water, and the subsequent passage of sodium chloride solution through the casing and zeolite filter bed for regenerating the zeolites. Auxiliary valves and pipes are provided for backwashing the filter beds to remove impurities in suspension, which have been arrested and collected by the filter beds.

The invention claimed by Gans resided in details of construction. No automatic operations or mechanical movements are involved in claims 1 and 5 of his patent, which are here in issue. As granted by the Patent Office, claim 1 reads as follows:

"1. A water-softening apparatus comprising a casing, a filter bed consisting of a layer of sand or quartz and a layer of zeolites or hydrated aluminosilicates disposed on the layer of sand or quartz, means for permitting the passage of water through the casing, means for cutting off the supply of water on the exhaustion of the zeolites, and means for passing through the casing a solution of a salt capable of regenerating the zeolites."

In tracing the history of this claim through the Patent Office, it is notable that the margin of patentability therein is restricted to disposition of the layer of zeolites upon a layer of sand or quartz. Gans failed to persuade the Patent Office that the claim, unless so limited, was patentable, for the file wrapper discloses that another claim, substantially the same as claim 1 of the patent, except for the limitation noted, was presented concurrently therewith, and was vigorously prosecuted on behalf of Gans, but without effect; the Patent Office holding that no new patentable combination was provided. The Bommarius patents, No. 519,565, No. 632,091, and No. 708,899, of earlier date, showed the same combination of structural elements. The Patent Office also took the view that the substitution of a filtering material of zeolites, as advocated by Gans, for the filtering material of sand provided by Bommarius, was a mere double use of the old Bommarius apparatus. Gans subsequently canceled and abandoned the broader claim.

It is to be observed that the means for backwashing the filter beds to which I have alluded are not included in claim 1, nor comprehended in the recital of elements which compose the claim. Gans' use of his apparatus involves passage of hard water through the casing from the top to the bottom, and passage of the regenerating solution also from top to bottom; withdrawals in both cases being made from the lowermost point of the casing. These are the only steps mentioned in the claim. I must assign, as the reason for failure to claim the means for effecting backwashing of the filter beds, the admission of want of novelty in this step, which is found at the beginning of page 2 of the specification, where it is stated that the backwashing is to be accomplished *in the usual manner,* by passing a current of water through the zeolite filter bed in the reverse direction, for the purpose of removing slime, mechanically collected matter, etc., which would mean a flow of backwash water from the bottom to the top of the casing. The same Bommarius patents cited by the Examiner during the prosecution of the Gans application fully disclose such backwashing for the purposes stated, and that there was nothing patentable to Gans in this step, or in the means for accomplishing it, is expressly conceded in the specification of the patent in suit. Moreover, all reference to backwashing was added to the specification by the patent solicitor long after the original application was sworn to, and there has been no supplemental oath by Gans upon which to support this claim of inventorship now being made for him by some one else.

Claim 5 of the Gans patent is as follows:

"5. Water softening apparatus comprising a casing, a filter bed consisting of a layer of zeolites or alumino-silicates, supporting means for said layer, means for permitting the passage of water through the casing, means for cutting off the supply of water on the exhaustion of the zeolites, means for

supplying and passing into the casing a solution of a salt capable of regenerating zeolites and means connected to the lowest point of the casing for removing the salt solution so introduced."

The file wrapper establishes that the feature of novelty upon which this claim rests is the last element of the combination; the means shown and described consisting of a funnel-shaped bottom to the casing which permits complete draining of the regenerating salt solution.

The defendants' device complained of comprises a series of stacks built up of individual cylindrical water softening units. Each unit comprises a casing in the bottom of which is disposed a filter bed of green sand or natural zeolites supported by a layer of gravel. There is no upper mechanical filter bed within the casing, such as shown and described in the Gans patent. The water to be treated is subjected to prefiltration through an outside sand filter connected and associated with the units through suitable piping. So far as the claims here involved are concerned, it makes no difference whether or not there is a sand filter at all for cleaning the water, or, if there is, whether it be within or without the casing, or even associated directly with the softener. The hard water to be softened is led into the casing of each unit near the top, and passes downwardly through the green sand filter bed, leaving the casing through a pipe connected with a series of distributer and collector cups, which are disposed in the supporting layer of gravel near the bottom of the casing. After the green sand has given up all of its sodium, a regenerating brine is introduced through this lower pipe, and flowing from the distributor cups passes upwardly through the green sand, leaving the casing through the pipe previously used for the introduction of the hard water. After a sufficient quantity of brine has been brought into contact with the green sand to fully regenerate the bed, the supply is shut off and fresh water for washing is passed through the casing in the same manner as in the regenerating step, namely, from the bottom to the top; the wash water removing the brine remaining in the casing and leaving the bed ready for the next softening operation.

To insure efficient and economical service, the designer of a zeolite water softening apparatus must take into account the dimensions of the casing, thickness of the zeolite filter bed, size and position of the various inlet and outlet pipes for water softened, for brine and wash water, and adapt them to the degree of hardness of the water to be softened, its rate of flow through the apparatus, the quantity of soft water required between regenerations, the water-softening capacity of the particular zeolites to be used, their specific gravity, the time required for their regeneration, the size of the grains, and the quantity of salt required to regenerate such zeolites.

The evidence shows that, with the same zeolites, a water softener to meet the requirements for a certain quantity of soft water in one locality will be differently proportioned throughout than a softener to meet the same requirements in another locality, where the hardness of the water is not the same. The rules governing the construction of apparatus are well known to the engineers and designers versed in this art.

Inasmuch as the defendants use green sand, which has different characteristics as to capacity and specific gravity or density than those of the artificial zeolites referred to by Gans in the opening paragraphs of his specification, the dimensioning and proportioning of apparatus to employ these differing zeolites would not be the same for any given installation. Hence proportions and dimensions are not involved in this case. The Gans patent can only purport to relate to principles of construction and operation. The drawings are merely diagrammatic. The patent teaches nothing respecting the details as to the dimensioning of the filter beds, the size of pipes, rates of flow, quantity of brine required for regenerating, or other factors which must be taken into consideration in the design of a softener to meet the particular requirements of the laundry, dye house, textile mill, steam plant, or other user desiring soft water for his operations. That the Gans patent does not inform the art as to these details of construction is not criticism, as his patent might be properly held to be sufficient if the combinations of his claims and the principles of construction and operation involved were novel.

In the judgment of this court they are not novel. The combination of the claims and the principles of construction and operation involved are shown in the prior art.

[2] With respect to claim 1, the plaintiff has conceded that the combination therein distinctly claimed was not novel or patentable to Gans by filing a disclaimer in the Patent Office some two years after this case was started. This disclaimer was induced by the discovery of a defense in the Centralblatt fur die Zuckerindustrie, Issue No. 49, September 7, 1907, a publication antedating the filing of the Gans application almost four years. This publication contains an illustration and description of a zeolite water softener; the disclosure being inspired by the Riedel Aktiengesellschaft, and consisting of the report of a lecture by its chief chemical technical adviser, Dr. Feldhoff, which was delivered before a group of sugar technologists. The apparatus illustrated and described by Feldhoff comprised a casing having a bed of gravel in the lower portion thereof, a bed of zeolites upon the bed of gravel, and an upper bed of gravel upon the bed of zeolites. All of the necessary pipes and valves were shown whereby to carry out the operations described, namely, the passage of hard water through the casing from the bottom to the top, then a regenerating solution for reviving the zeolites, this also passing from the bottom to the top, and finally the washing of the filter beds and the removal of the regenerating solution by the passage of fresh water through the casing again from the bottom to the top. The Feldhoff article clearly discloses every element of claim 1 of the Gans patent, and caused the plaintiff to file the following disclaimer:

### "Disclaimer.

"Your petitioner, the Permutit Company, a corporation of the state of Delaware, having its principal place of business in the city, county, and state of New York, represents that it is the owner of the entire right, title, and interest in and to patent No. 1,195,923, dated August 22, 1916, this patent having been granted on an application filed by Robert Gans, of Berlin, Ger-

many, to J. D. Riedel Aktiengesellschaft, of Berlin, Germany, as the assignee of Robert Gans, and having been duly assigned to your petitioner, by an assignment duly executed on the 10th day of November, 1916, by said J. D. Riedel Aktiengesellschaft, and fully recorded January 23, 1917, in the United States Patent Office in Liber K101, page 411; that it has reason to believe that, through inadvertence, accident, or mistake, the specification and first claim of said patent are too broad, including that which said Robert Gans was not entitled to claim in said patent.

"Your petitioner, therefore, does hereby disclaim from the scope of claim 1 of patent 1,195,923, any water-softening apparatus including a layer of zeolites or hydrated alumino-silicates disposed on a layer of sand or quartz in which the water to be softened is so introduced into the casing that it passes upwardly through said layer of zeolites.

"Signed at the city, county, and state of New York, February 26, 1920.
    "[Corporation Seal.]        . The Permutit Company,
                    "[Signed]  By Samuel Robert, President.
"Witnesses:
    "Archibald C. Marsh.
    "Arthur C. Marciante."

This disclaimer stands as an admission by the plaintiff that a water-softening apparatus comprising the five elements specified in claim 1 was not patentable. The structural features of Feldhoff are identical with the requirements of the claim; the only difference between Feldhoff and the operation of the Gans apparatus being in the matter of pipe and valve arrangement, whereby in Feldhoff the water to be softened is passed upwardly through the bed of zeolites, while in Gans it passes downwardly. The form of the disclaimer is such that, while admitting that the apparatus per se is old, plaintiff attempts to claim a monopoly in the use of the old apparatus in instances where the water to be softened is passed downwardly, instead of upwardly. This is not permissible and such a disclaimer cannot save the claim. Heald v. Rice, 104 U. S. 737, 26 L. Ed. 910; Bracewell v. Passaic Print Works (C. C.) 107 Fed. 467; Hailes v. Albany Stove Co., 123 U. S. 582, 8 Sup. Ct. 262, 31 L. Ed. 284; Strause Gas Iron Co. v. William M. Crane Co., 235 Fed. 126, 148 C. C. A. 620.

Plaintiff now seeks to go behind the disclaimer, and in the attempt to avoid its effect has offered testimony to show that the Feldhoff apparatus was inoperative. The witness Kriegsheim, now president of the plaintiff corporation, testified that many years ago he saw in Germany an apparatus which he says was like Feldhoff's, which had a bed of zeolites between a lower layer of sand or gravel and an upper layer of excelsior, and in which the flow of hard water, regenerating solution, and wash water was upward through the casing. He said that this apparatus was abandoned because upon examination it was found that the zeolites had worked up into the excelsior, had lodged there, and become foul with dirt, and that the excelsior had decayed. He said that upward filtration caused the formation of channels or preferential passages through which most of the water would flow, as a result of which only those zeolites in proximity to the channels would be utilized, thus materially lessening the efficiency of the device. He said that the upward passage of the wash water would lift the bed of zeolites against the perforated plate supporting the excelsior, thus clogging the perforations and making impossible the removal of the dirt. The evidence

shows that Kriegsheim, who prior to his connection with the plaintiff was employed by the Permutit Filter Company of Germany, did not enter the employ of the German company until some time in 1910. He was not a part of the Riedel organization at the time the Feldhoff lecture was delivered, and it does not appear that he had anything to do with the early operations of that company, or that he knew anything about them until late in 1909. On the other hand, plaintiff's witness Dr. Siedler, who was connected with the Riedel Company all of the time, from 1907 to 1912 as chief technical director of the factory, testified in open court that the main difficulty experienced with the Feldhoff apparatus was due to the composition of the zeolites, which in the early days were soft and unstable, and after a period of use became mushy and conglomerate. In this condition they were practically useless as filtering media. It appears, therefore, that the Feldhoff apparatus as such was not chargeable with the criticisms leveled at it by Kriegsheim, but that the failures to which he refers were due to the character of the zeolites employed. Moreover, in the particular device to which he refers, the upper layer of the filter bed was excelsior. The Centralblatt article says nothing about the upper layer being excelsior. This layer is not particularly described. It is indicated by the reference letter "b," which is the same reference letter used in designating the underlying bed, which is definitely stated to be gravel. The same apparatus illustrated and described by Feldhoff was patented by the J. D. Riedel Company in German Gebrauchsmuster No. 313,671 of July 25, 1907. In this Gebrauchsmuster the upper layer is definitely referred to as "gravel." Kriegsheim also contended that, because the layer of zeolites in the Feldhoff filter was confined between upper and lower perforated plates, there was no possibility of stirring up and rearranging the particles of the zeolites to break up channels, and no opportunity for self-grading to leave the finer particles on top and the coarser at the bottom, which arrangement had long been practiced in the filter art. See Bommarius, 632,091, and also the Gans article of April 15, 1909, in the Chemische Industrie. On the basis of Kriegsheim's testimony plaintiff has contended that the Gans patent should be sustained over Feldhoff, because it discloses in the drawings a filter bed of zeolites not confined by a perforated plate at its upper surface, because the flow of the hard water is downward through the zeolites, and because, upon backwashing, the zeolite bed may be lifted or expanded to permit rearrangement and self-grading of the particles.

The matter of unconfined bed and regrading is incidental to the step of backwashing. Gans never claimed any inventorship in this step, or any novelty in it. The patent says that backwashing is done in the usual manner. The usual manner is typified in the Bommarius patents. Bommarius patent, No. 632,091, shows an unconfined filter bed with the particles arranged so that the finer are on top and the coarser at the bottom, and refers to the boiling or stirring up of the particles of the filter bed during backwashing, as well as providing stirring mechanism to assist in breaking up the filter bed. Jewell patent, No. 478,261, shows the same thing.

Patents are not granted and cannot be sustained for doing things in the usual manner. There is nothing in the claims of the Gans patent relating to backwashing, unconfined beds, or self-grading of zeolites. There is nothing in the specification which points out that these are the features of the Gans invention upon which the patent is based.

If the patent had been granted because of these features, it would have been unnecessary for plaintiff to file the disclaimer. Feldhoff, showing no reversal of flow, would not have been of enough pertinency to have required recognition and the filing of the disclaimer.

The plaintiff has fallen far short of proving that the Feldhoff apparatus is not entitled to consideration as a valid reference. The plaintiff is not in position to criticize the disclosure of Feldhoff, for in the early stages of this case it sued these defendants upon, and brought forth for the favorable consideration of this court, the Duggan patent, 1,276,629, in Fig. 1 of which is shown an apparatus having a bed of zeolites confined between upper and lower perforated plates, and in which the flow of the hard water, regenerating solution, and wash water are all from the bottom upwardly through the casing, exactly as in Feldhoff. The Duggan patent was taken out by plaintiff as an improvement over the Gans patent; the operation described by Gans being expressly referred to therein. By taking out and suing these defendants on the Duggan patent, the plaintiff is committed to the proposition that the structure forming the basis for that patent is operative and useful. If the prior art was of no value, and the Gans patent had fully instructed the public as to the features which plaintiff now contends are indispensable to successful operation, the plaintiff of all persons would be expected to be so well informed as not to fall into the error of basing a patent on a structure that incorporates all of the alleged deficiencies of the prior art, and suing on that patent in the same case where the Gans patent was involved. Plaintiff claims not to have known of the existence of the Feldhoff disclosure, but that does not make its position any stronger. In the absence of any better proof than the unsupported testimony of the highly interested witness Mr. Kriegsheim, which is entirely discounted by the testimony of Dr. Siedler, and offset by the position taken by plaintiff at the outset of this suit, I am constrained to take the view that the criticisms leveled at Feldhoff are not supported by the facts, and are not such as to cause me to disregard the anticipatory character of this disclosure. If necessary, I should hold that there was no invention in claims 1 and 5 over the disclosure of Feldhoff alone.

It is unnecessary to base the decision wholly upon this ground. Taking claim 1 of the patent in the light of the disclaimer, which makes as the point of differentiation over Feldhoff the mere passage of water to be softened through the casing from the top downward, we find several instances in the prior art where this has been done. Of first importance is the Leister German patent, No. 211,064, published June 24, 1909, more than two years prior to the filing of the Gans application, and shown to have been owned by the same J. D. Riedel Aktiengesellschaft.

*Leister patent*

Fig. 1.

Fig. 2.

Fig. 3.

Fig. 4.

Fig. 5.

Fig. 6.

The Leister patent illustrates diagrammatically in Figs. 1 to 3, and describes an apparatus comprising a casing provided in its upper portion with a mechanical filter and in the lower portion with a chemical filter of zeolites. Unlike the Feldhoff apparatus, the upper filter layer is positioned above the surface of the zeolite bed, so that there is a space between the two. The water to be softened is introduced at the top of the casing, and passes downwardly first through the mechanical filter, where the matters in suspension are arrested, then through the space, and then through the zeolite filter, leaving the casing at the lowermost point; the casing being provided with a conical draining bottom. Between the zeolite and mechanical filter beds there is disposed at the side of the casing a discharge pipe controlled by a valve, which is for the purpose of removing the regenerating solution. This regenerating solution is introduced at the bottom of the casing, passes upwardly through the zeolites, and flows off through the discharge pipe referred to. After the brine has been removed from the casing in this manner, the valve in the brine discharge pipe is closed, and both filter beds backwashed from the bottom to the top; the backwash water flowing off through an outlet pipe, leading from the side of the casing above the surface of the upper mechanical filter. Except for the fact that defendants' apparatus does not have the mechanical filter within the casing, it is in all respects similar to the apparatus disclosed in Figs. 1 to 3 of the Leister patent.

It might be mentioned that in Figs. 4, 5, and 6 of Leister a two-part device is shown, the lower half of which is a complete softener in itself. This cell or unit does not contain an upper mechanical filter, and is thus identical in every respect with defendants' device.

In Figs. 1 to 3 the sources of the hard water, regenerating solution, and wash water are shown, as well as all of the piping and valves necessary to carry out the operations. The mechanical filter bed is shown by hatched lines, and the zeolite bed indicated by cross-hatched lines. No means of support for either of the beds is illustrated or described. This is a mere detail of well-known filter construction not necessary to be shown. The plaintiff contends that the solid lines, drawn horizontally to define the boundaries of the two beds, are representative of confining perforated plates supporting and covering the beds. The horizontal lines have no identifying letter nor numeral, while every detail of construction referred to is lettered or numbered.

Plaintiff contends that, inasmuch as these beds must be supported to retain their positions in the casing, the lower lines must indicate perforated plates, and that, inasmuch as the upper line in each case is the same as the lower line, an upper perforated plate must be considered as shown thereby. Plaintiff also contends that there must necessarily be a perforated plate on top of the zeolite bed, to keep the zeolites from washing away when the bed is being regenerated, and as basis for this contention asserts that the effective head under which the salt solution flows through the casing is greater than the effective head under which the wash water flows, and that, as the wash water rate is necessarily rapid to cause the loosening and removal of mechanically collected impurities, the rate at which the brine flows must be almost violent.

This contention is far-fetched and disingenuous. In the first place, the rates of flow may be and certainly would be regulated by the valves to meet the conditions of each installation, which, as I have heretofore pointed out, are different to meet different needs. The patent mentions such regulation.

In the next place, the drawings are only diagrammatic, they do not purport to be working drawings, and the matter of effective heads does not enter into the disclosure.

In the third place, the contention does violence to common sense and the practical knowledge of the art; it being the rule that the regenerating solution passes through the casing very slowly to allow time for the regenerating action and so as not to waste salt and water. The brine is relatively concentrated, large amounts of sodium being carried by a small volume of water. With plaintiff's zeolites the period of regeneration is from six to nine hours. With defendants' zeolites the regenerations consume less time, but are made more frequently. The rate of flow again depends upon the character of the zeolites, but in any case is very slow and quiet. It is therefore not at all necessary in Leister that the zeolite bed be covered by a perforated plate. The device is operative without such a plate, and, in the absence of any statement or intimation in the patent that it is so covered, I hold that the upper surface of the zeolite bed is free and unconfined. The solid horizontal lines shown are obviously merely boundary lines, to define the area to be covered by the cross-hatching lines. They are merely the draftsman's conventional way of making a presentable drawing.

I again call attention to the similarity of the defendants' apparatus to the Leister patent. Defendants' device is much closer to Leister than it is to Gans. The operation of defendants' device is identical with that of Leister, the construction being the same, except that the mechanical filter bed is omitted; defendants not having their mechanical filter within the casing. But in this respect it is likewise different from Gans. The disclosure of Leister is clear, exact, and sufficient to invalidate claims 1 and 5 of the Gans patent.

The defendants also offered in evidence German Gebrauchsmuster patent, No. 341,512, issued to August Neumann, of Reppen, Germany, June 15, 1908. This patent discloses a water softener of inverted cone shape in which an unconfined bed of zeolites is disposed. Water to be softened is introduced through a crosspiece distributor positioned above the surface of the zeolite filter bed, and passes downwardly through the bed, leaving through an opening in the bottom of the casing. A pail or receptacle is shown positioned under the discharge opening for collecting the softened water.

For regenerating, the patent illustrates and describes a bag for salt solution, which may be fastened to the open top of the casing. The regenerating flow is downward through the casing with removal at the lowest point.

The Neumann Gebrauchsmuster, No. 341,512, contains every element of claim 5 of the patent in suit, and is a complete anticipation of that claim.

No backwashing operation is described in this Gebrauchsmuster. Mr. Neumann, the inventor, was called as a witness by the defendants. He testified that apparatus substantially the same as that illustrated and described in Gebrauchsmuster, No. 341,512, was manufactured by him in Germany and sold commercially under the trade-mark "Aquariel," registered in Germany July 7, 1908, registration No. 109,095; that this apparatus operated successfully to soften water, and that many of the users had given testimonials which were advertised by Neumann and by the Permutit Filter Company of Germany, a subsidiary of the J. D. Riedel Company. Neumann had become associated with the Riedel Company, which knew of his ability as an engineer in the filter art, and which sought his assistance in designing apparatus wherein to utilize the permutit which had been devised by Dr. Gans. The Gans artificial zeolities were given the trade-name "Permutit." The record shows the entire relationship of Neumann to the Riedel Company and to the Permutit Filter Company. Neumann was first engaged to devise apparatus for utilizing permutite in the sugar industry. Later he was given the exclusive agency for Germany and Austria-Hungary to sell permutit, both for the sugar industry and for softening boiler feed water. Still later he became managing director of the Germany Permutit Filter Company; all of these relationships being covered by contracts which are in evidence.

In plaintiff's opening statement it was represented that the apparatus of the patent in suit was the first to successfully soften water by the use of zeolites, and that Gans by this invention had turned failure into success, had taken the last step, and had established the industry. The testimony of Neumann controverts the plaintiff's representation, and all testimony offered by plaintiff to the contrary. Neumann brought with him from Germany some of the original Aquariel filters, manufactured by him and sold commercially, and which had been used successfully for years. Of particular interest are the two Aquariel softeners sold to the court marshal at Meiningen back in 1908, which were used in the laundry of the Grand Duke. The smaller of these two filters is in its original state, and was used by passing the hard water downwardly through the zeolites. The larger one has been altered, so that the flow of the hard water is upward through the zeolites. The direction of flow is unimportant, as the softening is accomplished by merely passing the hard water through a sodium zeolite filter bed.

A recommendation was given by the court marshal based on the results obtained and was advertised extensively, first by Mr. Neumann, and later by the Permutit Filter Company. We find this testimonial and others, and frequent reference to the Aquariel filter in various catalogues, trade circulars, and publications emanating from and circulated by the Permutit Filter Company. Plaintiff's witnesses fall far short of meeting Neumann's testimony, which was supported by documentary evidence, regarding the successful results attained by the Aquariel filter.

Neumann also designed and erected softeners of greater capacity than the Aquariel filters, these larger installations being supplied for

industrial purposes. The first softener of this type which was designed by Neumann was sent to the Riedel Company's plant at Bohnsdorf, Germany. This filter was of the construction shown in the figure appearing in connection with the article in the Technische Rundschau of January 27, 1909. It had a cylindrical casing with a conical bottom. The zeolites rested upon a perforated plate, but were unconfined at the upper surface. A full equipment of pipes and valves was provided, and so arranged that the water to be softened could be directed either upward or downward through the zeolites. The regenerating solution was introduced at the top and flowed downward, leaving the casing from the lowest point. A float valve controlled the inlet of water and prevented overflowing; the casing being of the open or gravity type. During backwashing this float valve was temporarily manipulated, so that the wash water might flow freely to fill and overflow the casing. This Bohnsdorf filter was installed April 1, 1908, plans therefor having been submitted by Neumann to the Riedel Company in December, 1907.

Neumann told of other softeners of large capacity, which had been designed and sold by him. He produced a large number of early blueprints, showing the various designs made by him, and the correspondence passing between himself and the Riedel Company relating to his work on the construction end of the business, and with reference to particular installations. Neumann's duties were in connection with the designing and building of apparatus. He had nothing to do with the chemical end of the business. The manufacture of the zeolites, and the questions of analyses of water, the character of zeolites to be used, and the neutralization of acids in the water where present came under the jurisdiction of the eminent doctors employed by the Riedel Company in its department of chemistry. Dr. Gans was a chemist. So was Dr. Siedler and Dr. Massatch, the witnesses brought over from Germany by plaintiff.

These other early filters devised by Neumann and installed in various industrial establishments in every case had an unconfined bed of zeolites; where a mechanical filter or upper protecting layer of gravel was provided, this was positioned above the surface of the zeolites, leaving a free space between the two beds. In some cases the filtration was upward and in some cases downward. The correspondence between Neumann and the Riedel Company refers in several places to the question of the direction of flow, and also to the free space between the zeolite bed and the upper layer of sand or gravel. This correspondence establishes that, whatever advantage there might be in filtering downward and in having an unconfined bed of zeolites with a space between the upper surface thereof and the protecting layer of gravel above, credit therefor was due Neumann.

In my judgment the consideration of direction of flow, unconfined bed, and of free space above the zeolites have no place in this lawsuit, as the specification of the Gans patent lays no emphasis upon any of these features, not even mentioning the latter two, and the claims solicited and accepted by the patentee make no reference, directly or indirectly, thereto. They constitute no part of the patent, and would

not have been considered in the discussion, except for plaintiff's necessity for finding something to talk about in its effort to avoid the prior art. In attempting to distinguish the Gans structure from Feldhoff and Leister, plaintiff argues that what Gans really patented was a water softener, so arranged that the flow of hard water would be downward, and so that on backwashing the zeolite bed might be raised, or expanded in order to effect rearrangement of the particles, thus to cause better distribution of the water in flowing through the filter bed.

It is very clear to me that the Gans patent is not directed to these features of construction and operation. Gans never claimed to have invented them, so we have a case where the controversy centers about something that is not in the patent. In this situation it is as permissible for defendants to show that Gans could not have based his patent on these features of construction and operation as it is for plaintiff to argue that the claims should be modified by interpretation to include limitations and additional elements which would give to Gans something different than what he claimed. It is not a question of anticipation, for anticipation relates to that which is claimed. It is not a question of want of originality that is raised. I am proceeding on the theory, and have reached my conclusion on the assumption, that Gans himself, in law, and under the pleadings here, should be given credit for what is described and claimed in this patent, in so far as it was new and patentable over the prior art. What Neumann did in Germany, aside from what is shown in his patents, is not a technical defense, which may be raised against the validity of the claims of the Gans patent. It is not prior art. It has no effect to anticipate the claims of the Gans patent. Nevertheless, when it comes to the matter of arguing what should or should not be read into the patent to make it something different from what it is, the court is entitled to hear evidence on that point from the defendants as well as from the plaintiff. The plaintiff has offered the depositions of experts containing a great deal of testimony as to what the Gans patent covers, which is far different from what Gans himself said, in the specification and claims of his patent, constituted his invention.

Plaintiff's insistence upon adding by extraneous testimony and argument alleged essential subject-matter not referred to in the specification or included in the claims, if conceded by the court, would make the patent subject to invalidation for want of full, clear, and exact disclosure which the statute requires.

This case is of great importance to both sides and to the public. For that reason I have given it much time and careful consideration. The trial occupied nine very long days, about equally consumed by review of the depositions, hearing of the testimony of the witnesses from Germany, and argument by counsel. Because of the prior adjudication of the patent in suit, to which I shall refer more in detail hereafter, I have given both sides the fullest opportunity of presenting everything which might have a bearing on the case. With respect to plaintiff's contention that the Gans patent is entitled to credit for having revolutionized the art of water softening, I cannot at all agree. There is nothing in this patent which revolutionizes water soft-

ening. So far as the disclosure of the Gans patent is concerned, one might just as well pick out any of the prior art devices and make the same contention.

Nobody has been able to point out what was revolutionary about the invention covered by the patent in suit. I have asked the question over and over again, and I listened for nine days for an answer as to what there is in the Gans patent that is revolutionizing—what there is in the combination claimed that is new. The argument was that by having an unconfined bed the zeolites might be boiled up and rearranged by the backwashing. That is not the invention claimed by Gans. There is no invention in that feature. This was long known to and practiced by the filter art, and Gans, as his patent says, proceeds in the usual manner and according to old practice in reconditioning his bed by backwashing.

Gans did not make the first commercial and operative water softener. The Leister patent is operative. I am entirely satisfied as to that. Defendants' device is operative, and it is constructed and operates according to the disclosure of Leister. That proves the point.

The Neumann Gebrauchsmusters, Nos. 341,512, 341,650, and 342,212 were operative. Neumann's industrial devices were operative. I have seen the witnesses who testified concerning Neumann's activities. I have watched them and have been impressed by what they said. Although the testimony was in German, I have been favored here by an unusually fine interpreter. Not only was the interpreter very able and very fair, but he was a man who understood German well and spoke it well; he understood German technical language. These witnesses from Germany have all impressed me as being honest men. I did not want to embarrass them by asking them about it, but I assume they have all been paid for their time in coming here and have had their expenses paid; otherwise, they would not have come. It is natural and fair and easy to understand that they are interested on their respective sides of this lawsuit. It is only natural that they should show their interest.

In the case of the witness Neumann, I was particularly impressed with his candor, his ability, and his frankness. The things about which he testified happened a long time ago. Notwithstanding that fact, the exhibits introduced in evidence are all genuine; they are all beyond question; and in my way of thinking the written documents, the things that do not depend upon prejudice, or do not depend upon the danger of faulty memory, have all corroborated Neumann, so that my impressions which were formed by observing the appearance of the witnesses on the stand and listening to their testimony is borne out by the exhibits, the written, the unquestioned, the unerring things in the lawsuit. I am satisfied that this court, so far as this has importance in the case, is justified in relying upon Neumann's testimony, and I think that any court hereafter that considers this record can rely with safety upon Neumann's statements relative to the construction, operation, and success of the devices which he designed, built, and installed. He has been candid and frank, and his testimony has been corroborated by the written documents offered in evidence. He

came here with the documents and original apparatus ready to support his testimony.

The plaintiff's witnesses, Dr. Siedler and Dr. Massatch, impressed me as being honest men, a little more inclined to fight for their side of the lawsuit, a little more prejudiced in favor of their side, than Neumann was. The position they took with reference to the points covered by Neumann's testimony was unsatisfactory, in that their statements were not of the kind that you could put your finger on. Their testimony had to do with what somebody else thought years ago. They were chemists, members of a big group, business men, men highly educated, scholarly, and in a way theorists. They were part of the Riedel Company.

They learned how to make permutit; they learned its properties and characteristics, and experimented with it. Dr. Gans took out the patents on it. That was the extent of the matter so far as the Riedel Company was concerned at that time. This can be gathered in every line of their history as you read it in their contracts and correspondence with Neumann. It was the permutit that the Riedel Company was working on. They did not have it perfected at the time the curtain goes up on the invention here involved. It had been invented and patented, but they were at work perfecting the details; they did not have it so that it was uniform. The thing complained of was the lack of uniformity in operation.

I am satisfied, from the testimony I have heard, that the lack of uniformity in the operation of the early devices was due either to the faulty way in which the zeolites were made, or to the damage done the zeolites by foreign elements in the water not taken out by a preceding filtering step. In the early days much difficulty was experienced with water containing iron or acid; in some cases exceptionally dirty water was encountered. Experience has shown that somewhere in the process the water must be filtered, either chemically or mechanically, to remove the foreign matter in the water, which attacks the zeolites and makes them useless, or dirties them and makes them less efficient. These things, which in the early days rendered the zeolites less efficient, were problems for discussion and solution in the chemical laboratory. They were not factors which would necessarily influence the design of apparatus.

We see in the early days the big central organization of the Riedel Company, with all employees at work turning in all of the knowledge they could get on the subject of water softening. Dr. Gans and his assistants were turning in all their knowledge on the chemical side, and on the manufacture and betterment of the zeolites themselves. When it came to the designing of apparatus in which the zeolites were to be used, this was a matter of secondary importance. The thing of greater difficulty was the manufacture of the zeolites. I am satisfied that, so far as apparatus is concerned, Dr. Gans, like the two witnesses from Germany who testified in open court for the plaintiff, knew very little about that subject, and this observation is borne out by the testimony of these witnesses and by the things I have seen in writing.

The Riedel Company had other men that were practical men, mechanics, water-filtering experts, and designers of apparatus, all working and turning in their knowledge on that side of the matter; but the man who turned in something worth while and that was practical was Neumann. He is the one that built the machines that were operative and successful. It does not change my conclusion that there were a few letters of criticism of some of the early Neumann softeners. It is on this point that I think we are safe in relying upon the testimony of Neumann as to the cause of trouble, where trouble was encountered.

The plaintiff's witnesses, brought here from Germany, were not practical men. They were chemists and office men. They knew nothing of the installation of the apparatus. Their treatment of Neumann is about what you get from men in the office, who do not know anything about the things concerning which they are writing letters. Neumann was out on the firing line, fixing up filters that other Riedel men had improperly installed. There were many new problems encountered. Changes were necessary, due to conditions met for the first time, and unknown at the time the filter was designed and installed. The experience in one locality did not indicate necessarily what might be expected in another. With the varying requirements and composition of water, I should be greatly surprised if even to-day plaintiff did not receive complaints, or find it necessary to make alterations, and, of course, it is to be expected there would be more in the earlier days.

As to the Gans article in the Chemische Industrie of April 15, 1909, concerning which there is disagreement among the translators, I do not believe that this article is necessary in reaching or justifying my decision in the case. My notion, from my own knowledge of the German language and from a careful study of the testimony, is that the article says and means that the sand filter referred to is placed about one-third to one-half meter above the surface of the permutit layer. The record fully shows that, regardless of whether Gans or Neumann first thought of the unconfined bed, every one had agreed before that time that it was undesirable to have any layer of excelsior or sponges, or anything else on top of the permutit. Whoever is entitled to credit for having designed the filter built by Neumann and installed at Bohnsdorf, back in April, 1908, evidently the conclusion had then been reached that the permutit bed was to be free at the top like earlier sand filters. When the Gans article in Chemische Industrie was published, there is no doubt that—that Dr. Gans knew he wanted the permutit bed open and free, and it is not the natural thing that this educated man, this doctor, delivered a lecture, published it, and permitted it to be printed, describing an apparatus that had been discarded and was contrary to what had been decided was best.

Regardless of this point, however, the Gans article unmistakably discloses an apparatus in which a bed of permutit or zeolites is placed upon a layer of sand and in which the flow of hard water is downward. All of the translators agreed upon this part of the article.

My conclusion respecting the Gans article is that it makes the following disclosure:

"The apparatus consists of an iron or wooden filter. The height of the permutit layer is determined by the hardness of the specific water and the rapidity of filtration. The useful effect is greater, the more slowly the water flows through the permutit filter, and the finer the grain of the permutit used.

"The permutit bed lies upon fine sand which becomes coarser toward the bottom. At the top it is best closed off by a sand filter placed at a' height of about one-third to one-half meter above the surface of the permutit layer. The sand filter under many conditions can be replaced by a limestone filter, for instance, when treating water containing iron and acids. This arrangement of the upper sand or limestone filter will also prevent the specifically lighter permutits from being mechanically washed away by backwashing."

The sketches made in open court by the German witnesses, Neumann and Massatch, bear me out in this, and show what men skilled in the art gather from the text of the Gans article. It is not necessarily a matter of translation that is involved. It is the understanding gained from the article by those who understand technical German and are skilled in the art.

A review of the file wrapper of the patent in suit discloses that the Patent Office Examiner did not have before him any of the prior zeolite filter art to which I have referred. In view of the position taken by the Examiner during the prosecution of the Gans application it is clear that, if he had known of the Feldhoff article, of Gebrauchsmuster No. 313,671, of the Leister patent, of the Neumann Gebrauchsmusters, or of the Gans article in the Chemische Industrie, the patent in suit never would have been issued. On the other hand, we find that the Riedel Company, the original grantee from whom plaintiff acquired title, knew all about all of them, and at the time the Gans application was filed owned the Leister patent, and the Riedel and Neumann Gebrauchsmusters. Gans knew about the Feldhoff article, for he discussed it in the November 16, 1907, issue of the Centralblatt fur die Zuckerindustrie.

I do not think that there was anything patentable in the Gans apparatus, even over what was cited by the Patent Office; but after five years of wiggling, first dodging one way and then the other, making representations to the Patent Office that were not true, the two claims here involved, together with four others, were finally wormed out of the Patent Office. I do not remember ever reading a claim that assumed to go a shorter distance than claim 5. The claim that invention exists in providing a structure with an outlet at the lowest point to enable complete drainage is about the slimmest claim that I have seen in a patent for a long time. There is nothing to it, and it is not worth consideration. Claim 1 is just as false the other way. It claims a broad invention, and one that would be valuable if it could stand up; but it cannot, for it claims a combination that is old. And the most objectionable feature is that Gans and the Riedel people knew all the time that they were not entitled to this patent. They had knowledge of this prior art which would defeat the claims in an instant.

[3] The fact that the patentee knew all along of this prior art is sufficient to defeat the purposes for which the disclaimer was filed.

A disclaimer can only be availed of where, through inadvertence, accident, or mistake, a patent has been granted for more than the applicant was entitled to claim. In this case the soliciting and acceptance of claim 1 was deliberate and with full knowledge of the prior art. The oath was false, because these patents and publications were all dated more than two years prior to the filing of the Gans application. It makes no difference that plaintiff was not formally represented in the prosecution of the Gans application. Plaintiff can have no better right to file a disclaimer than Gans, the inventor, or the Riedel Company, the patentee, would have had, and neither of them could say that claim 1 was solicited by inadvertence, accident or mistake. They would not be heard to so contend, especially after the lapse of four years between the granting of the patent and the filing of the disclaimer, during which all the advantage flowing from ownership of the patent with the invalid claim had been enjoyed by the plaintiff. The disclaimer is void and of no effect to save the patent from anticipation.

There is danger of being misled in the consideration of this case by giving credit to the patent in suit for the results due to the peculiar properties of zeolites. When I heard the opening statements, I was given the impression that plaintiff was claiming credit here for the properties possessed by zeolites. This is the kind of lawsuit where a false background may easily be set up. Any one who hears of this is going to be greatly interested in it, as I have been. The story of zeolites is a wonderfully interesting subject. But the patent in suit is no more entitled to credit for the properties possessed by zeolites than a man is entitled to credit for making water run down hill, or is entitled to a patent on gravity. Zeolites and their properties and their manner of use are involved in the consideration of the patent in suit, but any thought which gives to the patent in suit any credit for the properties possessed by zeolites goes wide of the mark. There is one of the dangers connected with the trial of this lawsuit. The story of zeolites and of their peculiar and unusual and interesting properties is likely to lead to an undue amount of credit being given to the particular subject-matter of the claims that are in issue. We cannot give the patent credit for something that was old and previously known. We start out here with the fact that zeolites and their properties had been discovered, announced to the world, and patented. This had all been disposed of before the door opened on this lawsuit.

Nothing but the apparatus in which the zeolites are placed for use is involved in this lawsuit. The only issue is whether or not the combination of structural elements set forth in the claims in suit were novel. It has been shown that they were not.

The commercial success about which plaintiff has had much to say, is due entirely to the discovery and perfection of zeolites.

I have had in mind all through the hearing of the case the fact that this patent had been upheld in the Second circuit. Permutit Co. v. Harvey Laundry Co. (D. C.) 274 Fed. 937, affirmed in (C. C. A.) 279 Fed. 713; Permutit Co. v. Paige & Jones Chemical Co., Inc. (D. C.) 292 Fed. 239. The decisions there unconsciously caused me to ap-

proach the case with the expectation that the plaintiff was right. I could not resist that feeling; I had it when defendants were importuning me for leave to reopen the case to offer the newly discovered defenses, and when I was giving defendants more time, I was doing it with the almost unconscious thought that they were being given so much chance that they would not be complaining in some other circuit that they did not have a chance to make a proper showing. I did not expect that they would be able to lead me to the conclusion that the patent was invalid, in view of the holdings I knew had been made in the Second circuit. Those holdings, while not controlling in this court, are entitled to great weight, to great consideration, and to the confidence of this court, and I have given them that. I have studied them, and given them that weight and the consideration and respect to which they are entitled. They are very high authority, not only because of the high standing of the particular courts, but because they involve the same patent. Having done all that, I feel that the patent is void, and I cannot in conscience follow these prior decisions. That is one reason why this hearing has been so long. I have been responsible very largely for the length of time the hearing has consumed, and the reason for the time given to it is because I have seen this matter in a way that did not coincide with the decisions of the courts in the Second circuit. I was reluctant to reach a decision which would be contrary to the conclusions reached there; but I have had much to help me which those other courts did not have. I have heard new testimony and have been shown prior art which was not before the Circuit Court of Appeals.

I have never decided a patent case that was clearer or easier to decide, aside from the fact that these other decisions had been rendered. If it had not been for those decisions, I should have heard the case and reached my decision in half the time; but, having given it this full consideration, I feel sure there can be no question that, in view of the prior art, the patent in suit is utterly lacking in invention and is absolutely void.

The bill is dismissed, with costs to the defendants.