## PERMUTIT CO. v. WADHAM et al.

(Circuit Court of Appeals, Sixth Circuit. June 8, 1926.)

### No. 4105.

**1. Patents ⏂157(2).**

Courts will go as far as possible in overlooking technical defects and overruling defenses which are not clearly fatal in patent, resulting in great practical benefit to public, and treat it with all permissible liberality.

**2. Patents ⏂59—In suit on United States patent, earlier invention in Germany or earlier use there is of no importance.**

Neither earlier invention in Germany nor earlier use there is of any importance in suit on United States patent, especially where proof thereof was unexpected and patentee at a disadvantage in meeting it.

**3. Patents ⏂68.**

Nothing of earlier date in Germany and unpatented there invalidates United States patent, unless there was publication, which must be clear and explicit.

**4. Patents ⏂155.**

Disclaimer to avoid supposed anticipating or limiting effect of some other publication is not confession that patent would be void if disclaimer were not made.

**5. Patents ⏂155.**

Patentee, after having made disclaimer of portion of patent to avoid supposed anticipation, is still at liberty to deny anticipatory effect.

**6. Patents ⏂65.**

Ambiguity in drawings of foreign patent as to presence of screen which would prevent effective operation is fatal to defense of anticipation.

**7. Patents ⏂99.**

If specifications and drawings of patent show structure involving certain theory of operation, it is not necessary that patentee should expressly describe theory nor clearly understand it.

**8. Patents ⏂157(2)—Where specification shows limitation was contemplated, and language of claim is not clear to contrary, it may be so construed by reference to specification that patent may prevail.**

Although limitations on claim may not be imported from ambiguous specification into unambiguous claim for sake of saving validity

of patent, where specification clearly shows inventor contemplated limitation, and language of claim is not clear to contrary, it may be so construed by reference to specification that patent may prevail.

### 9. Patents ☞328.

Gans patent, No. 1,195,923, claims 1 and 5, for device for softening water by use of zeolite, held not anticipated.

### 10. Patents ☞66, 68.

Gebrauchmuster are not publications, and, if they are patents, their anticipatory effect is confined to the claim, for that is the thing patented.

### 11. Patents ☞109.

A new oath is not required on additions to patent specifications which do not bring in vital new matter.

In Error to the District Court of the United States for the Southern Division of the Eastern District of Michigan; Arthur J. Tuttle, Judge.

Patent infringement suit by the Permutit Company against Frank L. Wadham and others. Decree for defendants (294 F. 370), and plaintiff appeals. Reversed, and remanded for interlocutory decree.

James Q. Rice, of New York City, and John W. Peck, of Cincinnati, Ohio (M. C. Massie, of New York City, on the brief), for appellant.

Walter A. Knight, of Cincinnati, Ohio (Cromwell, Greist & Warden, of Chicago, Ill., and Knight & Phares, of Cincinnati, Ohio, on the brief), for appellees.

Before DENISON, DONAHUE, and KNAPPEN, Circuit Judges.

DENISON, Circuit Judge. This is the usual infringement suit based on claims 1 and 5 of patent 1,195,923, issued August 22, 1916, to Robert Gans, a German citizen, for a device for softening water.

The patent has been sustained upon final hearing in the Western District of New York, and, upon appeal, by the Second Circuit Court of Appeals, and again upon motion for preliminary injunction in the Southern District of New York. A full statement of the situation will be found in the opinions of Judge Hazel in the first of these cases (274 F. 937), of Judge Manton for the Circuit Court of Appeals in the same case (279 F. 713), and of Judge Learned Hand in the second case (292 F. 239). Reference should be had to these opinions for a full history and description. The District Court in the present case reached the contrary result, and held the patent invalid, or, if valid, not infringed.

Without repeating the details found in these opinions, it is sufficient now to say that it had long been known with regard to zeolites, a somewhat rare natural mineral combination, that they had the faculty of taking up the lime from hard water, thereby making it soft. This having been accomplished, and the zeolites then being charged with this lime, it in turn could be removed by putting them in salt water, after which they would again be ready to perform the softening operation. It seems that this process continued practically only a laboratory operation until Dr. Gans invented an artificial zeolite, which could be produced in large quantities at a practicable cost. He was associated with the manufacturing and engineering firm of Ridel & Co., and this firm at once took up with Dr. Gans and other engineers the project of devising and constructing a large scale apparatus which would accomplish cheaply and quasi automatically the softening of water for industrial and domestic uses, and the necessary intermittent regeneration of the zeolites. The ultimately accepted and the successful result of these efforts was the process of the apparatus shown in the patent here in suit.

[1] The process has gone into enormous use in this country, and rarely is there a case where a new art and industry are founded solely upon, and grow entirely from, a patent, so clearly as in this case. It is not claimed that there was ever any practice of the process by any one in the United States before the Gans application, and it is not to be denied that the entire commercial activities of all makers in this country have grown out of the commercial exploitation here by the owners of the patent. The actual savings in the arts and industries, as well as domestically, resulting from the existence of this successful and cheap method of turning hard water into soft, are beyond accurate computation, but are very great; and the practical benefit to the public resulting from the use of this device places it in the front rank of those useful instances of applied science which have distinguished recent years. With this background, it is clear that the patent should be treated with all permissible liberality, and that the courts will go as far as they rightly can in the way of overlooking technical defects and overruling defenses which are not clearly fatal.

In view of the full treatment given in the other cases, and the due application of the familiar rule of comity, the case can well be disposed of by relatively brief comment up-

on the points now chiefly relied upon in defense and the respects in which it is claimed this record may be distinguished from the former ones. The fundamental defense, and the one by which the court below was perhaps in the end chiefly moved, was that the device, in substance, uses only the common and well-known method by which water is passed through a filter bed to take out its impurities and then the filter bed is intermittently cleaned of these impurities. It is said that the chemical behavior of the zeolites in the presence of lime and salt water being well known, and the zeolites having become commercially available through Gans' first invention, and the operation of a filter being well known, there was no invention in substituting zeolites for the ordinary gravel or charcoal. This is a forceful argument, but we think a mistaken one. It was simple, perhaps too simple to be invention, to work out this process in the laboratory, or even domestically on a laboratory scale; but that was not worth while. The problem was to do it on a large scale, both economically and efficiently. Not only is it the common experience that the genius of invention is required to translate an experiment into an industry, but the history of this one shows it to be no exception. It is to be inferred from the record that Ridel & Co. energetically took up the commercializing of the process, using all necessary effort and capital. They employed one or two, if not several expert engineers, in addition to Dr. Gans, and capable constructors, yet one installation after another in different parts of Germany turned out to be a failure, even if it had seemed to start out successfully. The record justifies no conclusion except that this device, including some details which were not at first fully appreciated, but which are covered by the patent, was the practical solution of the practical difficulties, and for the first time, and after perhaps two years of effort through Ridel & Co., furnished the successful method which every one has used ever since. Such a process calls for chemical actions and reactions, as distinguished from the mechanical work of the ordinary water filter, thereby involving chemical problems which the most competent experts do not foresee, but in which apparently small steps turn out to be vital, as, for example, the necessity of draining the salt water from the very bottom instead of from a more convenient point a little higher. None of the experts seemed to know that even a little salt water remaining would interfere with the efficiency of the process. So, too, the necessity of the downward flow and of the free top to the bed are not taught by the old art of filtering. Upon the whole, we are clear that the novelty of the device is not to be judged merely by the filtration standard.

The records in the New York cases were identical with the record in the present case, excepting that, when the injunction motion was heard before Judge Hand, the record in the first New York case was supplemented by such additional defenses as had been developed up to that time in the present case, and, since Judge Hand's decision, there have been introduced into the record some explanatory matters and the oral testimony of the witness Neumann, who was sworn in open court upon the hearing below. The District Judge was much impressed by his testimony. It was to the effect that he was one of the engineers associated with Ridel & Co. in the development of the process, that its final success was due to him and not to Dr. Gans, and that various earlier devices which were said to be those described in certain publications had worked successfully.

[2, 3] We cannot give any effective force to this oral testimony. Not only was plaintiff left at a disadvantage in not being prepared to meet such unexpected proofs, where the hearing was in Detroit and all the data were in Germany, but neither earlier invention by others than Gans in Germany or earlier use by any one in Germany, is of any importance in a suit upon a United States patent. Nothing of earlier date in Germany and unpatented there invalidates the patent unless it was a publication; and the rule is firmly established that an earlier foreign language publication must be clear and explicit in the extreme.

Such publications cannot be effectively supplemented by proof that foreign devices which are now said to be the embodiments of the publications were actually constructed at the time and did successfully perform. Such proof is self-destructive. There can be no need for it unless upon the theory that the actual construction shows precisely what was intended by the published description; and, if the description is ambiguous enough to need this kind of support, it is fatally deficient.

One point now stressed is in regard to plaintiff's disclaimer. Under the language of the claim as issued, the flow of the water through the zeolites might have been either upward or downward. Early in the litigation a German publication was produced which was claimed to disclose the same process, but

which showed the water passing upwardly. The drawings and description in the patent in suit showed that the water flowed downwardly, and Gans became convinced, even if he did not at first appreciate, that the downward flow, as distinguished from the upward, was practically essential to a commercially successful process. He therefore disclaimed so much of the patent as might reach a process employing the upward flow, and thereby, in effect, amended and limited his claim to a device employing the downward flow. It is now said, first, that this disclaimer was a confession that the patent was anticipated except for the single matter of the direction of the flow and that there could be no invention in changing this direction; and it is said, second, that Ridel & Co. knew, and Gans must have known, of this earlier publication when he made his too broad claim, and hence that his original procuring of the patent was fraudulent, and he should not be permitted to cure it by disclaimer.

[4, 5] We do not understand that a disclaimer to avoid the supposed anticipating or limiting effect of some other publication is a confession that the patent would be void if the disclaimer were not made. The patentee decides a question of policy; he may think that, although the supposed anticipation can be successfully met and defeated, a disclaimer will not affect the real value of his patent, and to make it will save trouble and expense and do no harm. We see no reason why he is not at liberty, after the disclaimer as before, to deny the anticipatory effect of the other matter; and it has been so held. Manhattan Co. v. Helios Co., 135 F. 785, 802.

Nor does it follow that in this particular environment there is no patentable distinction between the down flow and the up flow. The former works satisfactorily, and it seems probable, if not certain, that the latter would not. The reasons why one will and the other will not show that this difference is one of those which are not so simple as they seem.

This case does not require us to consider what might be the curative efficiency of a disclaimer upon a claim which had been deliberately and fraudulently made too broad. It is not to be assumed that the solicitor who formulated in English a claim and made it cover more than the specific form shown by the drawings and foreign language description sent to him, had knowledge of the earlier foreign publication or had any fraudulent intent. Nor is it to be presumed that the foreign applicant was so familiar with the niceties of the English language and the complex-

ities of claims in United States patents as to charge him with intentional fraud, even if he did know of the earlier publication. So far as this record shows, the case was thoroughly appropriate for a precautionary curative disclaimer.

[6] The point most stressed is with reference to the Leister German patent. This was not before the Court of Appeals in New York, but it was before Judge Hand, and we concur in his view of it. Passing all other questions, it might be assumed that the Leister patent disclosed the patented thought, save for one exception. It now conceded that the zeolite bed must be free and unconfined upon its upper surface. The reason is that upon the backwash it must boil, so that the finer and lighter particles will go to the top and will then settle into a relatively impervious stratum, whereby the water when the softening operation begins will percolate through all parts and will not find free channels. In earlier instances of analogous effort, the zeolite bed had been supported by a screen upon the bottom, and it had been held down from the top either by a screen or by an immediately superposed bed of filter material. It is the claim of defendant that the Leister patent shows a zeolite bed free at the top. In deciding whether it does, the specification does not aid the drawing; and the drawing, which is a vertical cross-section of the whole structure, is in this respect obscure. There is an open space above the zeolite bed. The bottom and top of the zeolite bed are marked by heavy lines. It is conceded that the lower line indicates a supporting screen. Plaintiff says the upper line indicates a holding down screen. Defendant says it merely indicates conventionally the situation at the top of the zeolites. Similar lines above and below the nearby filter bed do indicate screens. Other inferences also are rather persuasive that this line represents a screen; but the very existence of the ambiguity is fatal to the defense. The fact that the Leister patent was soon forfeited for nonpayment of the trifling annual fee is confirmatory evidence that it was not the solution of the problem.

The trial below was also distinguished from the former hearings by the presence of a full-sized machine, which defendant's expert said he had built in conformity to the Leister patent, and which worked successfully. This proof had the vices of all such demonstrations in which, when it is pointed out that the constructor has departed in various respects from the literalness of the earlier patent, he excuses the departure by say-

ing that in these respects he used only common knowledge. This is most likely to be the knowledge which seems to him common after he has been for years familiar with the patented invention. In addition to several criticisms made by counsel, it is to be noticed that this exhibit machine has a free bed of zeolites instead of one confined by a screen on top; and we have already stated our conclusion that the Leister patent does not authorize this construction.

[7, 8] It is true that under the construction which we give the patent, and in order to sustain the patentable novelty of the device, the claim must be limited so as to involve the use of a zeolite bed which is free and unconfined upon the top, and that the specification does not expressly state this limitation nor does the exact language of the claim compel it. Nevertheless, the claim may be sustained without going beyond the liberality of construction proper to this patent. If the specifications and drawings of a patent show a structure clearly involving a certain theory of operation, it is not necessary that the patentee should expressly describe this theory, nor indeed that he should at that time clearly understand it: Goshen Co. v. Bissell Co., 72 F. 67, 74, 19 C. C. A. 13. The specification and drawing provide for the occasional descent into the zeolite bed from above of a revolving stirrer, and this makes it clear that the top of the zeolite must be free and unconfined, under the contemplation of these claims, like 1 and 5, which do not imply the nonuse of the stirrer. Limitations upon a claim may not be imported from an ambiguous specification into an unambiguous claim for the sake of saving the validity of a patent (McCarty v. Lehigh, 160 U. S. 110, 116, 16 S. Ct. 240, 40 L. Ed. 358); but, where the specification clearly shows that the inventor contemplated the limitation, and where the language of the claim is not clear to the contrary, it may be so construed by reference to the specification that the patent may prevail (Lamb v. Lamb [C. C. A. 6] 120 F. 267, 269, 56 C. C. A. 547); and the fact that the claim does not say, "substantially as described," is not controlling (National Co. v. Mark [C. C. A. 6] 216 F. 517, 515, 133 C. C. A. 13).

We put this patent in the above second class. The language of the claim, "a layer of zeolites disposed on the layer of sand or quartz," does not say how they are disposed, and is not inconsistent with such a disposition that the device will operate as planned and as shown. As Judge Hand points out, the absence from claims 1 and 5 of any high-

er sand filter "involves the free surface of the zeolites." A comparison of claim groups 1, 2, and 5 with group 3 and 4 emphasizes this distinction. Again, it would seem that by disclaimer the claim could be made to exclude any process which did not employ an unconfined zeolite bed. If the same result can be accomplished by any reasonable construction of existing language, there should be very compelling reasons before the court will feel forbidden to take this short cut.

[9] In the matter of validating a claim by implying a nonexpressed limitation, in order to save its validity as against the finally developed earlier art, there may well be a distinction between modifying by inclusion and by exclusion. In construing claim 1 in suit as calling for a zeolite bed unconfined at the top, we are not importing into the claim, for this limiting effect, a new and additional element not already named therein; we are rather importing from what the drawing shows, and the silence of the specification confirms a characterizing description of one of the elements which is named in the claim. We see that from this point of view the invention consists, not in the inclusion of something new, but in the exclusion of something old. When, therefore, we find that the apparatus will not perform as is contemplated, unless it is as free from a prior mechanical burden and obstacle as the specification and drawings indicate it to be, and when we conclude that the invention really covered by the patent is one not restricted by this former burden, we are sustaining its validity, not by limiting inclusion, but by definitory exclusion. We say, not that the claim should be limited to save it from anticipation, but that the anticipation was nonexistent because the earlier structure showed a feature which prevented the operation from being fully effective.

[10] Several gebrauchmuster are relied upon. Clearly these are not publications. That they are "patents" at all has been denied (Steiner v. Schwarz, Holt, D. J. [C. C.] 148 F. 868, 870); but, if they are, their anticipatory effect is confined to the claim, for that is the thing "patented" (Leeds v. Victor, 213 U. S. 301, 315, 318, 29 S. Ct. 495, 53 L. Ed. 805; Commercial v. Acetylene [C. C. A. 6] 192 F. 321, 112 C. C. A. 573); and the Gans patented invention is not covered by any gebrauchmuster claim.

[11] We find nothing in the file wrapper contents derogatory to the patents as issued. Claim 1 persisted unchanged from almost the beginning; the patentability of claim 5 rests as well upon the main combination as upon the addition of the low point outlet which

makes it relatively specific; and the additions to the specification which were made without a new oath did not bring in vital new matter, as we construe the rule on that subject. Kelsey v. Universal (C. C. A. 6) 296 F. 616, 618.

The certainty of conviction with which the District Judge reached his conclusion, and the force with which appellant's counsel have presented the points we have mentioned, and many others, have led us to hold the case for an unduly long time, in an endeavor to give thorough examination to all the contentions made. We think we have done so, but have discussed only what seemed to us the most forceful.

The decree below must be reversed, and the case remanded for the usual interlocutory decree on claims 1 and 5.