## PERMUTIT CO. v. GRAVER CORPORATION.

No. 4390.

Circuit Court of Appeals, Seventh Circuit.
Oct. 20, 1930.

George A. Chritton, of Chicago, Ill., and Drury W. Cooper, Mitford C. Massie, and Allan C. Bakewell, all of New York City, for appellant.

Charles L. Byron and George L. Wilkinson, both of Chicago, Ill., for appellee.

Before EVANS, SPARKS, and PAGE, Circuit Judges.

EVANS, Circuit Judge.

This appeal presents for determination the validity, and appellee's infringement, of claims 1 and 5 of the Gans patent, No. 1,195,923 covering an apparatus "for Softening of Water." The District Court found both claims invalid and dismissed the suit.

The Gans patent has been before the courts on numerous occasions. The two claims in question (1 and 5) have been upheld by two Circuit Courts of Appeal. 279 F. 713; 13 F.(2d) 454. They have also been sustained by three District Courts, but only two opinions have been reported. 292 F. 239; 274 F. 937. The same claims have been held invalid by two District Courts, the decision of Judge Tuttle (294 F. 370) being reversed in 13 F.(2d) 454. In the instant suit the District Court, in a well-reasoned opinion, expressed its unwillingness to follow the above-cited decisions because convinced that both claims were clearly void.

The inventor thus describes his invention:

"This invention relates to an apparatus for softening water in the use of zeolites or hydrated alumino-silicates.

"It is known that zeolites or hydrated alumino-silicates have the property of softening hard water and the present invention has for its object an apparatus in which the zeolites or alumino-silicates can be used in a filter and be regenerated therein so as to be capable of continuous use for the softening of water.

"The zeolites or hydrated alumino-silicates that occur in nature are ill adapted, without special treatment for the purpose, inasmuch as their capacity for the exchange of their base, upon which their property of softening hard water depends, is relatively small, while they have little or no capacity for regeneration or reconversion to their original condition, whereby they can be continuously used.

"Furthermore zeolites or hydrated alumino-silicates for use in softening hard water by mere filtration of the hard water through them must not only possess a high capacity for exchange of their base and a high capacity for regeneration or re-conversion to their original condition, but they must be hard and large grained, and adapted by their physical qualities for use as filtering media."

In speaking of the patent, the Court in 13 F.(2d) 454, 455, says:

"Without repeating the details found in these opinions, it is sufficient now to say that it had long been known with regard to zeolites, a somewhat rare natural mineral combination, that they had the faculty of taking up the lime from hard water, thereby making it soft. This having been accomplished, and

the zeolites then being charged with this lime, it in turn could be removed by putting them in salt water, after which they would again be ready to perform the softening operation. It seems that this process continued practically only a laboratory operation until Dr. Gans invented an artificial zeolite, which could be produced in large quantities at a practicable cost. * * *

"The process has gone into enormous use in this country, and rarely is there a case where a new art and industry are founded solely upon, and grow entirely from, a patent, so clearly as in this case."

The two claims in issue read:

"1. A water softening apparatus comprising a casing, a filter bed consisting of a layer of sand or quartz and a layer of zeolites or hydrated alumino-silicates disposed on the layer of sand or quartz, means for permitting the passage of water through the casing, means for cutting off the supply of water on the exhaustion of the zeolites, and means for passing through the casing a solution of a salt capable of regenerating the zeolites."

"5. Water softening apparatus comprising a casing, a filter bed consisting of a layer of zeolites or alumino-silicates, supporting means for said layer, means for permitting the passage of water through the casing, means for cutting off the supply of water on the exhaustion of the zeolites, means for supplying and passing into the casing a solution of a salt capable of regenerating zeolites and means connected *to the lowest point of the casing* for removing the salt solution so introduced."

About four years after the patent was issued, a disclaimer was filed which reads as follows:

"The Permutit Company, * * *, represents that it is the owner of the entire right, title and interest in and to patent No. 1,195,923, dated August 22, 1916, this patent having been granted on an application filed by Robert Gans, of Berlin, Germany, to J. D. Riedel Aktiengesellschaft, of Berlin, Germany, as the assignee of Robert Gans, and having been duly assigned to your petitioner, * * *; that it has reason to believe that, through inadvertence, accident or mistake, the specification and first claim of said patent are too broad including that which said Robert Gans was not entitled to claim in said patent.

"Your petitioner, therefore, does hereby disclaim from the scope of claim 1 of patent 1,195,923, any water softening apparatus in-cluding a layer of zeolites or hydrated alumino-silicates disposed on a layer of sand or quartz in which the water to be softened is so introduced into the casing that it passes upwardly through said layer of zeolites. * * * *"

It will be observed that the invention deals not with the use of zeolites as such, nor with the regeneration of zeolites, but rather with an apparatus which makes use of zeolites as a water softener and which also permits of the injection and removal of salt into the casing to regenerate the zeolites which have lost their potency through use. The discovery of zeolites and their use as water softeners long antedate the application for the patent in suit. Gans was a pioneer in the field of chemistry dealing with water softeners. Several years before applying for the patent in suit, he made application for a patent on artificial zeolites and a process of producing the same. In the specifications for this patent he recognized the then existing state of the art respecting the use of zeolites when he said:

"The purification or the softening of water may be effected in a simple manner by filtering the water through a layer of zeolites or alumino-silicate containing sodium.

"On the saturation of the zeolites with the bases of the salts contained in the hard water, the zeolites may be reconverted or regenerated by filtering through them a solution of a sodium salt, by which a sodium alumino-silicate is again produced."

Thus it will be seen that we are confronted by a combination product patent only. Utility of zeolites or the effect of salt on zeolites is not involved.

The two claims as originally allowed differed only in one respect, in the appearance in claim 5 of the last-named element, to wit, "means connected to the lowest point of the casing for removing the salt solution so introduced." After the disclaimer was filed the differences between the two claims increased, as the disclaimer only applied to claim 1.

Appellee argues that the disclaimer should also apply to claim 5. But we are unwilling to accept this contention. For while it might be said that the same reason existed for limiting his apparatus to such structures as introduced the water into the casing from the top, the fact remains that patentee specifically limited his disclaimer to claim 1. A disclaimer is the act of the patentee. The extent of such disclaimer must be determined by the words used. Here the disclaimer specifically limited its application to claim 1. We are,

therefore, not at liberty to extend it beyond the clear and binding limitations which the patentee described.

In view of our conclusion respecting the validity of the two claims, it is not necessary to describe the various forms of apparatus which appellee made and sold, some of which quite obviously did not infringe either claim 1 or claim 5 while others apparently did infringe one claim or the other.

Claim 1. Appellee contends, first, that the structure described by Gans, in claim 1, for the use of zeolites as a water softener and for regenerating zeolites, did not, regardless of the prior art, constitute invention. It also argues, as an alternative, that the validity of this claim must be denied in view of the prior art which showed similar structures, namely, a casing at the bottom of which was an unconfined body of zeolites through which the water passed either upwardly or downwardly, and means for the introduction of salt into the casing that the zeolites might be regenerated.

Appellant on the other hand denies the existence of an anticipating prior art or a prior art sufficient to teach the skilled mechanics how to make the apparatus defined and described in the patent. It asserts novelty over the prior art in two respects: (a) An unconfined bed of zeolites, and (b) means for causing the water to pass downward through the zeolites.

Appellant's counsel describes the novelty of the Gans invention, thus:

"The apparatus of the patent is relatively simple. It comprises a cylindrical container near the bottom of which is a horizontal perforated plate on which is a layer of gravel. This gravel supports a bed of zeolites. At a distance above the zeolite bed, and *so as to have a free space above it*, into which the bed may rise or boil up, is a plate which carries filtering material. * * *

"There are two features of construction of a zeolite softener which are of the greatest importance in carrying the invention of this patent into effect. These features are:

"(1) The zeolite bed must be free and unconfined at its top so that the zeolites can lift, loosen, or boil up to prevent accumulation of dirt or slime in the bed; and to permit a rearrangement of the grains to destroy preferred channels and construct a top layer of fine grains in the production of a uniform resistance across the entire top area of the bed.

"(2) After regeneration the spent salt solution must be completely removed from the casing to prevent contamination and rehardening of the water on the next softening run."

Respecting the novel feature (b) appellant relies upon the holding of the Court in 13 F.(2d) 454, 456, where it was said:

"Under the language of the claim as issued, the flow of the water through the zeolites might have been either upward or downward. Early in the litigation a German publication was produced which was claimed to disclose the same process, but which showed the water passing upwardly. The drawings and description in the patent in suit showed that the water flowed downwardly, and Gans became convinced, even if he did not at first appreciate, that the downward flow, as distinguished from the upward, was practically essential to a commercially successful process. * * *

"Nor does it follow that in this particular environment there is no patentable distinction between the down flow and the up flow. The former works satisfactorily, and it seems probable, if not certain, that the latter would not. The reasons why one will and the other will not show that this difference is one of those which are not so simple as they seem."

In the instant suit the advantages or disadvantages of an apparatus calling for a downflow of water through the zeolites were sharply contested. The District Judge found, contrary to the observations of the court in the last cited case: "The evidence in the instant case is conclusive to the effect that upward flow softeners are in fact of greater utility and efficiency than downward flow softeners."

An examination of the evidence not only sustains the finding of the District Court, but persuasively supports it. In view of the object to be accomplished, it would seem difficult, if not impossible, to say there was either merit or novelty in providing means which called for the downflow rather than the upflow of water through the bed of zeolites. The finding of the District Court, however, conclusively eliminates this asserted novelty (b) which resides in an apparatus which provides for the *downflow* of the water through the zeolites.

Confronted with a problem of providing means for the introduction of water into a casing at the bottom of which was a layer of gravel upon which rested a layer of zeolites, and through which the water was to pass, the mechanics had the choice of running the water upward or downward. As no new results attended the flowing of the water either way, it merely called for the exercise of discre-

tion on the part of the mechanic to place the opening either at the top or at the bottom of the casing.

Much stress is placed on the novel feature (a), the unconfinable character of the bed of zeolites. The advantages of an *unconfined* bed of zeolites are now stoutly proclaimed. Because open at the top it is claimed that the zeolites receive the water and the salt more freely and evenly and both the water softening and the zeolite regeneration are more complete. For the purpose of the argument only it may be ceded that an unconfined zeolite bed had merit as well as novelty. But of what significance is this fact to the patentee who did not include in his specifications or in his claims a zeolite bed so limited?

We have looked in vain, in the claims and in the specifications of the Gans patent, for any language which mentions a zeolite bed which is free and unconfined. If the novelty of this invention, as it is now asserted, resides in the free and unconfined bed of zeolites, it is more than passing strange that the inventor should make no reference, either in specifications or in claims, to that which marked his advance over the prior art. Courts are not permitted to read into a claim a limitation of one of the elements which the patentee has not seen fit to impose. For what is not claimed by the patentee belongs to the public.

If there was a suggestion in either specifications or claims that permitted of an inference that a limitation of this element was intended, we might find some basis for supporting the construction for which appellant contends. But there seems to have been a studious avoidance of words of limitation—a designed effort to make the elements as broad as possible which is entirely inconsistent with the now asserted limitations to this element without which validity cannot be recognized.

Moreover, there is another reason why this claim 1 is invalid.

If we read into this claim this limitation, and assume that the Gans patent called for an *unconfined* bed of zeolites, a study of the prior art leads us to the same conclusion. In short, there was no novelty in the unconfinable character of the bed of zeolites.

This prior art, a study of which is necessary to ascertain whether novelty resided in the unconfinable character of the zeolites, is supplied largely by German chemists. Foremost among them is Gans. Much of the prior publications came from his pen. Some appear in his patents. Other articles are written by his associate.

Some dispute has arisen over the translation of a Gans article written in the German language. In a study of the various translations and in the differences that arise over them it is significant that Gans himself did not testify or explain or attempt to explain what appellee asserts was fatal to his right to a patent in the United States. He also failed to explain why he did not apply for a patent in Germany on the apparatus here under consideration. Gans was evidently an inventor who knew the value of patents, and the record shows he secured several of them in the United States. His failure to secure one in Germany suggests, at least, that he was perhaps embarrassed by this prior art.

Gans caused an article to be published April 15, 1909 on the subject "On the Technic of Water Purification." Quotations therefrom are here made:

"The process, which is in question for this purpose, is in its most simple form a pure exchange process by which the calcium and magnesium of the water are taken up by the zeolite and the sodium is given off to the water. * * *

"The regeneration is performed by washing off the zeolites, which have been saturated with calcium or magnesium, with a common salt solution, by which means a sodium zeolite is again produced which is again able to soften new quantities of water. * * *

"There are already several filters of this sort in use, some to prepare soft water for boiler feed purposes and others for laundries. The filter plants mentioned are remarkable through the simplicity of their arrangement. * * *

"The apparatus consists of an iron or wooden filter, the height of the permutit bed is determined by the hardness of the specific water and the rapidity of filtration. The useful effect is greater the more slowly the water flows through the permutit filter and the finer the grain thereof.

"The permutit bed lies upon fine sand, which becomes coarser at the bottom. *At the top it is best closed off by a sand filter placed about one-third to one-half meter above the surface of the permutit layer.* The sand filter under many conditions can be replaced by a limestone filter, for instance, when treating water containing iron and acids. This arrangement of the upper sand or limestone filter will also prevent that by back-washings, the specifically lighter permutits are not mechanically washed away. * * *

"* * * Various filters of this kind are already in use, partly for the production of

soft water for boiler supply purposes, partly *for laundries*.

"The filter plants in question are notable for the simplicity of their arrangement.

"The softening is complete even in the case of cold water."

There would be little question of the complete anticipation of the Gans patent by this Gans article were it not for the fact that appellant challenges the correctness of that part of the translation (fifth paragraph) which is italicized.

There are several reasons aside from the testimony of the qualified translator which support the District Court's finding respecting the correctness of the above translation. We need not elaborate them. The District Court discussed them and concluded that they were most persuasive, particularly in the absence of any explanation by Gans.

There were other publications which evidenced rather clearly the state of the prior art. The German patent to Hans Leister, No. 211,064, contained drawings wherein the bed of zeolites was unconfined. The Technische Rundschau article of January 27, 1909, was on the subject of water treatment with permutite. Permutite is another name for zeolite. Witnesses on the trial could not agree as to whether the article showed the zeolites to be in a locked bed or unconfined. The Feldhoff article of September 7, 1907, dealt extensively with the use of the Gans artificial zeolites for softening water and also disclosed an apparatus for the use of such zeolites. The following is quoted therefrom:

"The water to be purified is led in from below, passes through a layer of gravel, provided for the protection of the permutites from mechanical impurities, forces itself through the permutite layer and leaves the filter fully de-limed by the outlet funnel d. When the filter is exhausted one passes a hot fifteen percent solution of sodium chloride through it and the proportion of about one-half kilogram salt to every cubic meter of the water filtered, and moreover via the same path as the water, by turning the two-way valve. In circulating the salt solution—the step of regeneration,—a lower circulation speed is chosen about one-fifth to one-sixth of the original rate of flow. Thereafter follows washing out with a strong stream of water until all the salt has been removed, when the filter is again ready for use. Here I have a 're-generation.'"

The article also stated "that the water to be purified is led in from below, passing through the layer of gravel, then through the

layer of permutite and leaves the filter fully de-limed at outlet funnel D at the top."

It was this article which caused appellant to file its disclaimer. Other prior art citations were the Bommarius patents, Nos. 519,565 and 632,091, each covering a "filter" and each describing an apparatus for filtering water for drinking and other purposes. While neither contemplated the use of zeolites, both covered apparatuses for use where water passed through a filtering bed, obviously a kindred art.

Defendant also offered in evidence two Gebrauchsmuster, Nos. 341,512 and 313,671. Both of these Gebrauchsmuster we have excluded in reaching our conclusion. They were at best merely cumulative proof of a prior art and added nothing to the facts established by the other evidence. The other proof left us in no uncertainty.

We were likewise not satisfied that they came within the provisions of section 31, title 35, USCA. Convinced as we are that neither Gebrauchsmuster covered the Gans apparatus described in the patent in suit, it follows that only the printed publication in the foreign country would be a bar to the Gans application in the United States. As the printed publication is restricted to the claims of the Gebrauchsmuster, it seemed extremely doubtful whether Gans' right to a patent in the United States could be barred by the disclosures in the specifications of the Gebrauchsmuster.

The weight of authority seems to exclude the use of the entire Gebrauchsmuster as anticipation. But the courts are divided on the question. Permutit Co. v. Wadham (C. C. A.) 13 F.(2d) 454; American Chain Co., Inc., v. Bethlehem Bumper Corp. (D. C.) 25 F.(2d) 759; Acme Acetylene Co. v. Commercial Acetylene Co. (C. C. A.) 192 F. 321; Permutit v. Paige & Jones Chemical Co., Inc., (C. C. A.) 22 F.(2d) 916; Safety Gas Lighter Co. v. Fischer Bros. & Corwin (D. C.) 236 F. 955; Steiner v. Schwarz (C. C.) 148 F. 868, 870; Fireball Gas Co. v. Commercial Acetylene Co., 239 U. S. 156, 36 S. Ct. 86, 60 L. Ed. 191; Leeds & Catlin Co. v. Victor Co., 213 U. S. 301, 319, 29 S. Ct. 495, 53 L. Ed. 805; General Electric Co. v. Alexander (C. C. A.) 280 F. 852.

We have eliminated the two Gebrauchsmuster from our consideration of the case.

The sum total of all this prior art citation leaves it tolerably clear (a) that it was old and well recognized to use zeolites for softening water, (b) to regenerate zeolites with salt, and (c) that the usual apparatus

for accomplishing such purpose was in general similar to the Gans apparatus which in turn was like water filtering apparatuses widely used.

This apparatus consisted almost of necessity of a container, usually a steel casing, into which the water entered and out of which it passed. The location of the entry and the exit holes was optional with the mechanic and depended on whether he desired the water to flow downward or upward.

Into this case the filtering material was placed, usually resting on a bed of gravel. Over the filtering material another bed of gravel was sometimes, though not always, placed, to prevent the filtering material from washing away. This upper bed of gravel either rested upon or was placed somewhat above the bed of filtering material. Both ways are suggested, and both ways were used.

In addition means had to be provided for permitting the regenerating material to pass in and out of the casing and through the filtering material. Inasmuch as there was no advantage in introducing the salt below or above the zeolites, the mechanic or plumber naturally placed the exit hole at or near the bottom of the casing.

Claim 5. The validity of claim 5 can only be sustained (in view of our holding claim 1 invalid) on the theory that the last-named element "means connected to the lowest point of the casing for removing the salt solution" introduced a novel element which evidenced something more than the skill of a mechanic. If there be novelty in this element it is traceable solely to the location of the means at the lowest point of the casing. To provide the means for an outlet at the bottom of the casing (to secure a perfect drain) can, we think, by no stretch of the imagination, be described as invention. It is hardly conceivable that one (a mechanic or an unskilled artisan) constructing an apparatus of the kind here under consideration would locate the opening to drain off the substance (liquid or solid), temporarily inserted, at any place other than at the bottom.

Moreover, the prior art here, too, stands between Gans and a valid patent. The Technische Rundschau contains a drawing of an apparatus for water softening through the use of zeolites and for regenerating the zeolites, which drawing located the means for removing the solution at the lowest point of the casing. One of the Bommarius filters had its outlet at the extreme bottom.

Finally it might be added that appellee's structures have their openings near the bottom but not at the lowest point of the casing, and therefore do not infringe claim 5. This is not so as to certain discarded structures, but, as to its presently used structures, infringement of claim 5 is not shown.

Counsel for appellant persuasively and properly argue that the presumption which arose from the grant of this patent has been greatly strengthened by the holdings of several courts. The force of this argument cannot be minimized. The respect we entertain for these courts need hardly be stated. But the litigants have a right to the independent judgment of this court. The responsibility resting on us cannot be delegated. Nor can it be avoided. Nor can we ignore the opinions of other courts that have filed carefully prepared opinions wherein different conclusions have been reached. Moreover, we are satisfied that the record in the instant case is somewhat different from the records presented on the other appeals.

Extensive use has also been stressed by counsel as a reason for upholding the patent. That there has been an extensive use of zeolites for water softening purposes must be admitted. Such use strongly evidences outstanding merit in this mineral compound for water softening purposes. We are not, however, impressed with the argument that the extensive use is attributable to the apparatus for holding and regenerating the zeolites. The art was advanced by the discovery of the product,—zeolite in natural and artificial form,—and in the discovery of the water softening qualities of this product, supplemented by the further discovery that such article could be regenerated readily and cheaply. Gans obtained a patent in this country on zeolites and the process for making them. If this patent were assailed and doubt existed as to its validity, the extensive use relied on would strongly support the patent. But we cannot ascribe this extensive use to both the commodity and to the apparatus for its use, when convinced that its actuating cause is to be found in the article only.

The decree is affirmed.